UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | |
|---|---|
| LOUIS LEKUS, Individually and on Behalf of All Others Similarly Situated,<br><br>                        Plaintiff,<br><br>        vs.<br><br>STRAYER EDUCATION, INC., ROBERT S. SILBERMAN, MARK C. BROWN, and KARL MCDONNELL,<br><br>                      Defendants. | Case No<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES LAWS**

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 ("1934 Act"). The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.

2.      Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the acts complained of herein occurred in this District and many of the false and misleading statements were directed to investors in this District.

3.      Strayer Education, Inc. ("Strayer" or the "Company") is a Maryland company with its executive offices located in Virginia. The Company operates approximately seventy-eight (78) physical campuses in the United States and also maintains online programs. Specifically, the Company has twelve (12) campuses in Florida, including Jacksonville, Miami, Coral Springs, Ft. Lauderdale, Orlando, Maitland, Miramar, Palm Beach Gardens, and Tampa. Within this District, the Company operates its: (i) Tampa East Campus, 6302 E. Martin Luther King Blvd., Suite 450, Tampa, FL 33619; and its (ii) Tampa Westshore Campus, 4902 Eisenhower Blvd., Suite 100, Tampa, FL 33634.

4.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## INTRODUCTION

5.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Strayer between November 1, 2007 and October 13, 2010, inclusive (the "Class Period"), against Strayer and certain of its officers and/or directors

for violations of the 1934 Act.  These claims are asserted against Strayer and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the SEC.

6.  Strayer is a for-profit post-secondary education services corporation that offers undergraduate and graduate degree programs in business administration, accounting, information technology, education, health care, public administration and criminal justice at 78 physical campuses in Florida, Alabama, Arkansas, Delaware, Georgia, Kentucky, Louisiana, Maryland, New Jersey, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, West Virginia, and Washington, D.C.  Strayer offers a variety of academic programs through its wholly-owned subsidiary Strayer University, Inc. ("Strayer University") both in traditional classroom courses and online via the Internet.  According to the Company, Strayer University's mission is "to make higher education achievable and convenient for working adults in today's economy."

7.  During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results.  Specifically, defendants failed to disclose that the Company had been engaging in abusive and fraudulent recruiting and financial aid lending practices, thereby increasing Strayer's student enrollment and revenues.  As a result of defendants' false statements, Strayer's common stock traded at artificially inflated prices during the Class Period, reaching a high of $258.48 per share on April 21, 2010.

8.  Significantly, the U.S. Department of Education proposed new regulations for programs, such as those run by Strayer, to continue to be eligible to receive federal financial aid. The tests for eligibility would be based on repayment rates and debt-to-income loads.  Under the proposed "gainful employment" regulations, programs would need to have a repayment rate of at

least 45% to continue to be eligible for federal financial aid. The regulations, if adopted, will go into effect in July 2011.

9.      On August 13, 2010, after the market closed, the U.S. Department of Education released data on federal student-loan repayment rates at the nation's colleges and universities. The data showed that repayment rates were 54% at public colleges and 56% at private non-profit institutions, compared to just 36% at for-profit colleges. Significantly, the data showed that the repayment rates at Strayer were a mere 25% – well below the cutoff of 45%.

10.     On this news, the price of Strayer stock dropped 18.37% – or $36.75 per share – from a closing price of $200.01 on August 13, 2010 to a closing price of $163.26 per share on August 16, 2010, the following trading day, on a 482% increase in trading volume.

11.     On October 14, 2010, Strayer stock fell another 13% after another for-profit education company, The Apollo Group, announced a big drop in its enrollment numbers after the market closed on October 13, 2010. Strayer stock fell on October 14, 2010 because the market perceived that a similar drop in enrollment was in Strayer's future. On October 28, 2010, the other shoe dropped and Strayer announced the anticipated lower enrollment figures.

12.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

        (a)      the Company failed to disclose that it had engaged in improper and deceptive recruiting and financial aid lending practices and, due to the government's scrutiny into the for-profit sector, the Company would be unable to continue these practices in the future;

        (b)      the Company failed to maintain proper internal controls;

        (c)      many of the Company's programs were in jeopardy of losing their eligibility for federal financial aid; and

(d)    as a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were false and misleading and lacked a reasonable basis when made.

## PARTIES

13.    Plaintiff Louis Lekus purchased Strayer common stock as described in the attached certification and was damaged thereby.

14.    As set forth above, Strayer is a for-profit post-secondary education services corporation that conducts substantial business in Florida.

15.    Defendant Robert S. Silberman, ("Silberman") has served as Chairman of the Board and Chief Executive Officer of Strayer since 2000. During the Class Period, while Strayer stock was artificially inflated, Silberman sold 331,478 shares of Strayer stock at prices between $145.08 and $228.40 per share, for insider trading proceeds totaling $64,764,320.

16.    Defendant Karl McDonnell ("McDonnell") has served as President and Chief Operating Officer of Strayer since 2006. During the Class Period, while Strayer stock was artificially inflated, McDonnell sold 18,142 shares of Strayer stock at prices between $211.13 and $236.25 per share, for insider trading proceeds totaling $4,277,457.

17.    Defendant Mark C. Brown ("Brown") has served as Chief Financial Officer of Strayer since 2001. During the Class Period, while Strayer stock was artificially inflated, Brown sold 51,265 shares of Strayer stock at prices between $181.03 and $216.91 per share, for insider trading proceeds totaling $10,366,992.

18.    Defendants Silberman, McDonnell and Brown (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Strayer's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. They were provided

with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

19.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Strayer. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Strayer common stock was a success, as it: (i) deceived the investing public regarding Strayer's prospects and business; (ii) artificially inflated the prices of Strayer common stock; and (iii) caused Plaintiff and other members of the Class to purchase Strayer common stock at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

## CLASS ACTION ALLEGATIONS

20.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Strayer common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

21.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Strayer has almost 14 million shares of stock outstanding, owned by hundreds if not thousands of persons.

22.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the price of Strayer common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

23.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from defendants' wrongful conduct.

24.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

25.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

26.     The Class Period begins on November 1, 2007.  On that date, Strayer issued a press release reporting its financial results for the 2007 third quarter ended September 30, 2007. The Company reported net income of $9.3 million or $0.64 diluted earnings per share and revenue of $69.8 million for the quarter.  The November 1, 2007 press release also announced that total enrollment at Strayer University for the 2007 fall term increased 15% to 36,082 students.

27.     On this news, Strayer stock closed up 2.92% - or $5.25 - to close at $185 per share on November 2, 2007.

28.     From December 3, 2007 through December 5, 2007, while the price of Strayer stock was artificially inflated, Brown sold 14,583 shares of Strayer stock at prices between $181.03 per share and $181.41 per share, for insider trading proceeds totaling $2,643,764.

29.     On February 14, 2008, Strayer issued a press release reporting its financial results for the 2007 fourth quarter and full year ended December 31, 2007.  The Company reported net income of $19.5 million or $1.34 diluted earnings per share and revenue of $89.1 million for the quarter.  The Company reported net income of $64.9 million or $4.47 diluted earnings per share and revenue of $318 million for the year.  The February 14, 2008 press release also announced that total enrollment at Strayer University for the 2008 winter term increased 16% to 37,323 students.

30.     On February 28, 2008, while the price of Strayer stock was artificially inflated, Silberman sold 66,500 shares of Strayer stock at prices between $156.79 per share and $164.05 per share, for insider trading proceeds totaling $10,789,535.

31.     Also, on March 6, 2008, while the price of Strayer stock was artificially inflated, Silberman sold 33,500 shares of Strayer stock at $145.08 for insider trading proceeds of $4,860,180.

32.     On April 30, 2008, Strayer issued a press release reporting its financial results for the 2008 first quarter ended March 31, 2008.   The Company reported net income of $23.5 million or $1.64 diluted earnings per share and revenue of $97.1 million for the quarter.   The April 30, 2008 press release also announced that total enrollment at Strayer University for the 2008 spring term increased 19% to 37,733 students.

33.     On May 2, 2008, while the price of Strayer stock was artificially inflated, Silberman sold 100,000 shares of Strayer stock at $190.85 for insider trading proceeds of $19,085,000.

34.     Also on May 2, 2008, while the price of Strayer stock was artificially inflated, Brown sold 10,000 shares of Strayer stock at $194.52 for insider trading proceeds of $1,945,200.

35.     On July 24, 2008, Strayer issued a press release announcing the Company's financial results for the 2008 second quarter ended June 30, 2008.   The Company reported net income of $21.3 million or $1.50 diluted earnings per share and revenue of $97.9 million for the quarter.   The July 24, 2008 press release also announced that total enrollment at Strayer University for the 2008 summer term increased 20% to 34,176 students.

36.     On October 30, 2008, Strayer issued a press release announcing the Company's financial results for the 2008 third quarter ended September 30, 2008.   The Company reported net income of $11.8 million or $0.83 diluted earnings per share and revenue of $87 million for the quarter.   The October 30, 2008 press release also announced that Strayer was increasing the

Company's annual dividend to $2.00 per share from $1.50 per share. In addition, it reported total enrollment at Strayer University for the 2008 fall term increased 24% to 44,564 students.

37.     On December 1, 2008, while the price of Strayer stock was artificially inflated, Silberman sold 131,478 shares of Strayer stock at $228.40 for insider trading proceeds of $30,029,600.

38.     On February 12, 2009, Strayer issued a press release reporting its financial results for the 2008 fourth quarter and full year ended December 31, 2008. The Company reported net income of $24.2 million or $1.71 diluted earnings per share and revenue of $114.3 million for the quarter. The Company reported net income of $80.8 million or $5.67 diluted earnings per share and revenue of $396.3 million for the year. The February 12, 2009 press release also announced that total enrollment at Strayer University for the 2009 winter term increased 22% to 45,697 students.

39.     On February 16, 2010, while the price of Strayer stock was artificially inflated, McDonnell sold 342 shares of Strayer stock at $211.13 for insider trading proceeds of $72,207.

40.     On April 30, 2009, Strayer issued a press release announcing the Company's financial results for the 2009 first quarter ended March 31, 2009. The Company reported net income of $29.1 million or $2.07 diluted earnings per share and revenue of $124.5 million for the quarter. The April 30, 2009 press release also announced that total enrollment at Strayer University for the 2009 spring term increased 22% to 46,038 students.

41.     On July 30, 2009, Strayer issued a press release announcing the Company's financial results for the 2009 second quarter ended July 30, 2009. The Company reported net income of $27.5 million or $2.00 diluted earnings per share and revenue of $125.9 million for

the quarter. The July 30, 2009 press release also announced that total enrollment at Strayer University for the 2009 summer term increased 24% to 42,516 students.

42.     From August 5, 2009 through August 6, 2009, while the price of Strayer stock was artificially inflated, Brown sold 25,417 shares of Strayer stock at prices between $216.56 per share and $216.91 per share, for insider trading proceeds totaling $5,509,560.

43.     On October 29, 2009, Strayer issued a press release announcing the Company's financial results for the 2009 third quarter ended September 30, 2009. The Company reported net income of $16.7 million or $1.21 diluted earnings per share and revenue of $114.4 million for the quarter. The October 29, 2009 press release also announced that total enrollment at Strayer University for the 2009 fall term increased 22% to 54,317 students.

44.     On February 11, 2010, Strayer issued a press release announcing the Company's financial results for the 2009 fourth quarter and full year ended December 31, 2009. The Company reported net income of $31.9 million or $2.32 diluted earnings per share and revenue of $147.2 million for the quarter. The Company reported net income of $105.1 million or $7.60 diluted earnings per share and revenue of $512 million for the year. The February 11, 2010 press release also announced that total enrollment at Strayer University for the 2010 winter term increased 21% to 55,106 students.

45.     On February 16, 2010, while the price of Strayer stock was artificially inflated, Brown sold 1,265 shares of Strayer stock at $212.23 per share, for insider trading proceeds of $268,468.

46.     On April 21, 2010, the price of Strayer common stock hit its class period high of $258.48.

47.    On April 29, 2010, Strayer issued a press release announcing the Company's financial results for the 2010 first quarter ended March 31, 2010. The Company reported net income of $36.4 million or $2.65 diluted earnings per share and revenue of $157.9 million for the quarter. The April 29, 2010 press release also announced that total enrollment at Strayer University for the 2010 spring term increased 22% to 55,970 students.

48.    On June 10, 2010, Senator Tom Harkin, chair of the U.S. Senate's Health, Education, Labor and Pensions Committee, announced that he would be holding a series of hearings to examine federal spending at for-profit colleges. The press release provided in pertinent part:

> Senator Tom Harkin (D-IA), Chairman of the Health, Education, Labor and Pensions (HELP) Committee, today announced that he plans to hold a series of hearings to examine federal education spending at for-profit higher education institutions. The hearings will begin June 24th.
>
> "In the past two years we have made major new investments to expand federal financial aid," said Harkin. "Pell Grants and student loans now provide more than $20 billion to for-profit higher education companies every year. We need to ensure for-profit colleges are working well to meet the needs of students and not just shareholders. We owe it to students and taxpayers to make sure these dollars are being well spent."
>
> Between 1998 and 2008 the for-profit sector has grown from 550,000 students to 1.8 million, a 225 percent increase. Students at for-profit institutions are borrowing more, and more frequently, than their peers at non-profit schools, and according to the Department of Education, one in five students who left a for-profit college in 2007 defaulted on their loan within three years.
>
> The Committee will examine a broad range of issues related to the growing role of the for-profit higher education sector, including the scope and rapid growth of the federal investment in for-profit higher education and the corresponding opportunities and risks for students and taxpayers. Details on the first hearing will be available in the coming weeks.

49.    On June 16, 2010, the U.S. Department of Education announced that it was proposing new tougher regulations on the industry designed to protect college students and taxpayers from abusive or fraudulent practices.

50.     On June 24, 2010, the Senate held the first of its hearings entitled "Emerging Risk? An Overview of the Federal Investment in For-Profit Education."

51.     By the end of June 2010, Strayer's stock was trading at $207.89, down 19% from its Class Period peak of $258.48 on April 21, 2010.

52.     On July 29, 2010, Strayer issued a press release announcing the Company's financial results for the 2010 second quarter ended June 30, 2010.  The Company reported net income of $35.7 million or $2.60 diluted earnings per share and revenue of $159.3 million for the quarter.  The July 29, 2010 press release also announced that total enrollment at Strayer University for the 2010 summer term increased 23% to 52,221 students.

53.     On July 30, 2010, while the price of Strayer stock was artificially inflated, McDonnell sold 17,800 shares of Strayer stock at $236.25 for insider trading proceeds of $4,205,250.

54.     On August 3, 2010, news began to leak into the market concerning the findings from an undercover operation conducted by the U.S. Government Accountability Office ("GAO") on recruiting techniques used in the for-profit higher education industry.

55.     As a result, on August 3, 2010, Strayer stock declined $10.56, or 4.41%, from a closing price of $239.51 on August 2, 2010, to a closing price of $228.95 on August 3, 2010.  As news continued to come out concerning details of the government's investigation and the anticipated repercussions from the investigation on Strayer's business and prospects, Strayer stock continued to decline.

56.     For example, on August 3, 2010, The New York Times published an article entitled "For-Profit Colleges Mislead Students, Report Finds," stating in pertinent part, as follows:

Undercover investigators posing as students interested in enrolling at 15 for-profit colleges found that recruiters at four of the colleges encouraged prospective students to lie on their financial aid applications — and all 15 misled potential students about their programs' cost, quality and duration, or the average salary of graduates, according to a federal report.

The report and its accompanying video are to be released publicly Wednesday by the Government Accountability Office, the auditing arm of Congress, at an oversight hearing on for-profit colleges by the Senate Committee on Health, Education Labor and Pensions.

The report does not identify the colleges involved, but it includes both privately held and publicly traded institutions in Arizona, California, Florida, Illinois, Pennsylvania, Texas and Washington, D.C. According to the report, the colleges in question were chosen because they got nearly 90 percent of their revenues from federal aid, or they were in states that are among the top 10 recipients of Title IV money.

The fast-growing for-profit education industry, which received more than $4 billion in federal grants and $20 billion in Department of Education loans last year, has become a source of concern, with many lawmakers suggesting that too much taxpayer money is being used to generate profits for the colleges, instead of providing students with a useful high-quality education.

The report gave specific instances in which some colleges encouraged fraud. At one college in Texas, a recruiter encouraged the undercover investigator not to report $250,000 in savings, saying it was "not the government's business." At a Pennsylvania college, the financial representative told an undercover applicant who had reported a $250,000 inheritance that he should have answered "zero" when asked about money he had in savings — and then told him she would "correct" his form by reducing the reported assets to zero, a change she later confirmed by e-mail and voicemail.

At a college in California, an undercover investigator was encouraged to list three nonexistent dependents on the financial aid application.

In addition to the colleges that encouraged fraud, all the colleges made some deceptive statements. At one certificate program in Washington, for example, the admissions representative told the undercover applicant that barbers could earn $150,000 to $250,000 a year, when the vast majority earn less than $50,000 a year. And at an associate degree program in Florida, the report said, a prospective student was falsely told that the college was accredited by the same organization that accredits Harvard and the University of Florida.

According to the report, courses in massage therapy and computer-aided drafting that cost $14,000 at a California for-profit college were presented as good values, when the same courses cost $520 at a local community college.

13

Six colleges in four states told the undercover applicants that they could not speak with financial aid representatives or find out what grants and loans they were eligible for until they completed enrollment forms agreeing to become a student and paid a small application fee.

And one Florida college owned by a publicly traded company told an undercover applicant that she needed to take a 50-question test, and answer 18 questions correctly, to be admitted — and then had a representative sit with her and coach her through the test. A representative at that college encouraged the applicant to sign an enrollment contract, while assuring her it was not legally binding.

But in some instances, the report said, the applicants were given accurate and helpful information, about likely salaries and not taking out more loans than they needed.

57.     On August 4, 2010, the GAO issued its report detailing its findings.  At the request of Congress, the GAO undertook its investigation to determine if for-profit colleges engaged in fraudulent, deceptive or otherwise questionable marketing practices.  The GAO's report cited many instances of abuse in the sector, finding that many of the companies in the industry employed fraudulent and deceptive practices in their student recruitment, targeting students who used federal financial aid to pay for their schooling.  The study was presented at a Senate education hearing held on August 4, 2010, as part of the ongoing government inquiry into the for-profit education sector.  This was the second of the Senate's hearings on the industry, and was entitled "For Profit Schools: The Student Recruitment Experience."

58.     As a result, the price of Strayer common stock declined $8.31, or 3.64%, from a closing price of $228.46 on August 4, 2010, to a closing price of $220.15 on August 6, 2010, on a 73% increase in trading volume.

59.     On August 10, 2010, Strayer issued a press release stating that on August 5, 2010, the Company received a letter from Senator Tom Harkin, Chairman of the U.S. Senate Committee on Health, Education, Labor, and Pensions, requesting documents as part of a review of matters related to for-profit colleges whose students receive Title IV aid.  Also on August 5,

2010, the U.S. Department of Education notified Strayer that it would conduct a program review of Strayer University's administration of Title IV programs.

### The Truth Begins To Be Revealed

60.     On August 13, 2010, after the market closed, the U.S. Department of Education released data on student-loan repayment rates at the nation's colleges and universities. The data showed that the repayment rates were 54% at public colleges and universities, 56% at private non-profit institutions and 36% at for-profit colleges. The data showed that the repayment rate at Strayer University was just 25%.

61.     In addition, the U.S. Department of Education proposed new regulations for programs to continue to be eligible to receive federal financial aid. The tests for eligibility would be based on repayment rates and debt-to-income loads. Under the proposed "gainful employment" regulations, programs would need to have a repayment rate of at least 45% to continue to be eligible for federal financial aid. The regulations, if adopted, will go into effect in July 2011. Based on the proposed regulations, many of Strayer's programs are in jeopardy of losing their financial aid status.

62.     On this news, the price of Strayer's stock decreased $36.75, or 18.37%, from a closing price of $200.01 on August 13, 2010, to a closing price of $163.26 on August 16, 2010, the next trading day, on a 482% increase in volume of shares traded.

63.     On October 13, 2010, after the market closed, The Apollo Group, the largest for-profit education company, pulled its fourth quarter guidance and announced a drop in enrollment:

> Apollo Withdraws 2011 Forecast Citing Enrollment Drop
>
> Apollo Group Inc., the biggest education company by enrollment and operator of the University of Phoenix, withdrew its forecast for fiscal 2011 citing

regulatory scrutiny and declining numbers of new students. The shares fell about 12 percent in extended trading.

Apollo expects a drop in new enrollment for its degree programs to accelerate in the first quarter of 2011, resulting in "significant year-over-year decline," the Phoenix-based company said today in a statement.

Enrollment growth at Apollo slowed as the company faced competition to sign up more students for its four-year bachelor's degree programs, said Trace Urdan, an analyst with Signal Hill Capital Group in San Francisco. Apollo also pointed toward increased regulatory pressure from Washington, where the Obama administration is preparing new rules governing the recruitment of students by for-profit colleges.

"This is a spooky characterization, when they're talking about significant year-over-year decline in enrollment without setting a bottom," said Urdan, who rates the shares "buy" and doesn't own them, in a telephone interview.

64.    On October 14, 2010, a press release discussed Apollo's announcement, as well

as its implications for other for-profit companies:

For-profit schools reel as rules affect enrollment

Enrollment at for-profit schools to drop, tighter admissions to affect low-income students

NEW YORK (AP) -- The nation's largest for-profit college says it will take a big hit to enrollment -- and its bottom line -- as it tightens admission practices. The move comes as the government ramps up regulation of an industry which critics say preys on lower-income students and leaves them with hefty debt loads and meager job prospects.

The number of lower-income students enrolled at for-profit colleges has surged in the past few years. Big advertising budgets drew those trying to bolster their resumes as a hedge against high unemployment. But critics claim the schools are not helping students find better jobs and say enrollment counselors sign up many who are unprepared for higher education. When they drop out, they are still stuck paying back their student loans.

Defaults on student loans have been rising, sticking taxpayers with the bills. So the government has proposed regulations that could limit schools' access to federal financial aid if graduates' debt levels are too high or too few students repay loans.

Amid intense scrutiny of the industry, Apollo Group Inc. said Wednesday it will provide new students with a free three-week trial program to see if they

are ready for its University of Phoenix curriculums -- weeding out those at risk of leaving school before earning degrees. And it will no longer pay its counselors bonuses based on how many students they enroll.

"Now, they have to slow down enrollment and be less active in targeting these students. They have to go back to the more traditional students who are working adults," said Matt Snowling, an analyst at FBR Capital Markets.

65.   On October 14, 2010, after its October 13, 2010 after-market announcement, Apollo Group stock fell by 25%.  But Apollo Group was not alone.  Other for-profit education stocks, including Strayer, fell by material amounts -- Strayer fell about 13% from an October 13, 2010 close of $155.96 to an October 14, 2010 close of $135.05 -- as well because the market understood what the future held for these companies.  In other words, the market understood that Strayer's enrollment would also slow down as the government ramped up regulatory scrutiny

66.   On October 28, 2010, when Strayer announced lower enrollment, the market was proved right.  A news article that day stated:

Amid uncertainty, Strayer prunes new campus plans

**\* Q3 new student starts down 2 pct, vs yr-ago 20 pct growth**

\* Sees Q4 EPS $2.64-$2.66 vs est $2.99

\* Raises dividend by a third, ups share buyback

\* Shares flat, after 11 pct fall pre-market (Recasts; adds conference call details, updates share movement)

By Megha Mandavia

BANGALORE, Oct 28 (Reuters) - **Strayer Education Inc (STRA.O) reported its first drop in new student enrollments in at least five years,** and said it was cutting back on expansion plans, as the government looks to rein in an industry that has come under fire for failing to educate students and leaving them in debt.

Shares of the $1.8 billion Arlington, Virginia-based education provider slumped 11 percent pre-market, but rallied later as proposed new rules from the Department of Education appeared less strict than had been predicted.

"Given the uncertainty surrounding both the regulatory and political
environment we are operating in, it is prudent to dial back the investment plan
slightly," the company said on a conference call with analysts.

Strayer, whose new student enrollments fell 2 percent in the latest quarter,
versus 20 percent growth a year earlier, said it planned to open only 8 new
campuses in 2011, the lowest since 2007, according to analyst Amy Junker of
Robert W. Baird.

"Campus openings are the primary determinant of Strayer's growth," said
Junker, who downgraded the stock to "neutral" and more than halved her price
target on the stock to $125 from $307.

"We were recommending Strayer based on the thesis that fundamentals would
not meaningfully deteriorate, which is no longer the case," she said.
(Emphasis added).

67.     The true facts, which were known by the defendants but concealed from the

investing public during the Class Period, were as follows:

(a)     the Company failed to disclose that it had engaged in improper and

deceptive recruiting and financial aid lending practices and, due to the government's scrutiny

into the for-profit sector, the Company would be unable to continue these practices in the future;

(b)     the Company failed to maintain proper internal controls;

(c)     many of the Company's programs were in jeopardy of losing their

eligibility for federal financial aid; and

(d)     as a result of the foregoing, defendants' statements regarding the

Company's financial performance and expected earnings were false and misleading and lacked a

reasonable basis when made.

## ADDITIONAL SCIENTER ALLEGATIONS

68.     As alleged herein, defendants acted with scienter in that defendants knew that the

public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Strayer, their control over, and/or receipt and/or modification of Strayer allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Strayer, participated in the fraudulent scheme alleged herein.

69.     The Individual Defendants' insider sales of approximately $80 million – while in possession of material, insider information – is also probative of their scienter.

## LOSS CAUSATION/ECONOMIC LOSS

70.     During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Strayer common stock and operated as a fraud or deceit on Class Period purchasers of Strayer stock by misrepresenting the Company's business and prospects. Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market through a series of disclosures, the price of Strayer stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Strayer common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws when the above-described revelations reached the market and the artificial inflation was removed.

## NO SAFE HARBOR

71.     Strayer's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

72.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Strayer who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**COUNT I**

**FOR VIOLATION OF §10(b) OF THE 1934 ACT AND RULE 10b-5**
**AGAINST ALL DEFENDANTS**

73.     Plaintiff incorporates ¶¶1-72 by reference.

74.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Strayer common stock during the Class Period.

76.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Strayer common stock and sustained substantial losses when that artificial inflation was removed as a result of the disclosures described herein.  Plaintiff and the Class would not have purchased Strayer common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

## FOR VIOLATION OF §20(A) OF THE 1934 ACT AGAINST ALL DEFENDANTS

77.     Plaintiff incorporates ¶¶1-76 by reference.

78.     The Individual Defendants acted as controlling persons of Strayer within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Strayer common stock, the Individual Defendants had the power and authority to cause Strayer to engage in the wrongful conduct complained of herein.  Strayer controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Plaintiff and the members of the Class damages, including interest;

C.     Awarding Plaintiff reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 7, 2010

**BARKER RODEMS & COOK, P.A.**

Chris A.Barker
cbarker@barkerrodemsandcook.com
400 North Ashley Drive, Ste. 2100
Tampa, FL 33602
Telephone: (813) 489-1001
Facsimile:  (813) 489-1008

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein
Sandy A. Liebhard
Joseph R. Seidman, Jr.
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone: (212) 779-1414
Facsimile:  (212) 779-3218

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

_____ ("PLAINTIFF"), declares the following as to the claims asserted under the federal securities laws:

1.      Plaintiff has reviewed the complaint filed in this matter and has authorized the filing of a complaint based on similar allegations in a related or amended complaint. Plaintiff retains Bernstein Liebhard LLP and such counsel they deem appropriate to associate with to pursue such action.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff=s counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Certification.

4.      Plaintiff's transaction(s) in the **STRAYER EDUCATION, INC.** security that is the subject of this action during the class period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 25 | STRA | Buy | 12/30/2009 | $214.42 |
| 10 | STRA | Buy | 3/18/2010 | $245.40 |
| 10 | STRA | Buy | 5/8/2010 | $240.81 |
| 10 | STRA | Buy | 9/27/2010 | $174.93 |
| 10 | STRA | Buy | 9/27/2010 | $171.06 |
| 65 | STRA | Sell | 11/29/2010 | $140.60 |

5.      Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

6.      Plaintiff is not currently seeking to serve as a representative party for a class in any actions filed under the federal securities laws.

7.      Plaintiff has title over the Strayer shares at issue as well as title to legal claims concerning such shares.

8.      Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

9.      The undersigned is authorized to sign this Certification on behalf of Plaintiff.

10.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

11.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30ᵗʰ day of NOVEMBER, 2010.

_____
Signature

Louis J. Lekus_____
Print Name